## GOULD v. GRAFFLIN.

### (District Court, D. Maryland. July 10, 1894.)

DEMURRAGE—LIABILITY OF CHARTERER—READINESS TO TAKE CARGO.

    A schooner was chartered to load a full and complete cargo, not exceeding 1,150 tons; but her master, on tendering her, stated that she had been leaking, and asked to have 500 or 600 tons furnished, and, if that did not increase the leak, so much more as she could safely carry. *Held,* that the charterer was justified in refusing this, and was not liable for the delay until the master, after a survey, gave notice that he would take a full cargo.

This was a libel by Moses M. Gould, master of the schooner Florence, against George W. Grafflin, charterer of said schooner, for demurrage for detention of the vessel by delay of defendant in furnishing cargo.

Robert N. Smith, for libelant.

T. M. Lanahan and Frank Gosnell, for respondent.

MORRIS, District Judge. The schooner Florence was chartered by the respondent to proceed from Galveston to Punta Gorda, Fla., and there load a full and complete cargo of phosphate rock, not exceeding 1,150 tons, to be furnished at the rate of 100 tons per day. The libelant stipulated that the schooner should be tight, staunch, strong, and in every way fitted for the voyage. The schooner sailed from Galveston in ballast, and reported in Punta Gorda on March 14, 1893, the master saying he would be ready for cargo on the 16th. He accompanied this tender, however, with the statement that his vessel had been leaking somewhat, and he did not think he would be able to take anything like a full cargo, as he could not tell how much she might leak when she was loaded. He asked to have five or six hundred tons of rock sent to the vessel, and said he would try that, and see if she could safely carry any more. This was not a tender which gratified the charter party. The charterer was not required to load the schooner unless she could carry a full and complete cargo, such as would usually be carried by a tight and seaworthy vessel of her class and tonnage. Here the tender was qualified with the statement that the vessel was leaking, and that the master would have to find out, while loading, whether or not the cargo increased the leak, and how much she could safely carry. It is obvious that the master distrusted the schooner, and did not mean to tender her as ready for a complete cargo until he had observed what effect resulted from putting the cargo into her. He had found she leaked some while light on the voyage from Galveston. He expected stormy weather coming up the coast in March, and he did not mean to risk his vessel, and he intended, as soon as he found that the loading increased the leak, to stop. The charterer's agent was justified in refusing to furnish cargo when the tender of readiness to receive it was accompanied with such qualifications. This attitude of the parties toward each other continued until March 27th, when the master, finding the leak did not increase, had his vessel surveyed by three pilots of the port, who, after examination, certified that she was seaworthy. On March 28th, after the survey, the master notified the charterer's agent as follows: "I declare my vessel in condition for cargo, as per charter party-and as per survey, and will take a full and complete cargo, as per charter party." Thereupon, the cargo was promptly furnished, and the schooner sailed with 1,005 tons. I think it is clear that the delay from March 16th, when the master said he would receive 500 or 600 tons, and so much more as he found he could safely carry after he had tested its effect on the leaking of his schooner, to March 28th, when he finally, after a survey, definitely said that he was prepared to receive a full and complete cargo, was not by the default of the charterer. Libel dismissed.